Rutland,
February,
1843.

Giddings &
Wife et al.
v.
Smith et al.

---

SILAS GIDDINGS and WIFE, ROSWELL BATES, DAVID BATES, LOUIS BATES, HARRIS BATES, AMY BATES, and HOPEY BATES *v.* DENNIS SMITH and JONATHAN RUSSELL.

The probate of a will made in 1781, it not appearing that the heirs, &c., were notified, is good. The judge of probate had jurisdiction, and his proceedings are presumed to have been regular after such a lapse of time.

A will made in 1774, and proved in 1781, may be read at this time, without further proof, when both parties claim under the same devise.

In such a will, a devise to E. H. and the lawful heirs of her body, gave her an estate tail.

Such an estate is not barred by the deed of herself and husband, acknowledged in 1797, before a justice of the peace.

Her issue, after her death, are not estopped from claiming the estate, in consequence of any covenant of warranty contained in the deed. The statute of conveyances did not enable a feme tenant in tail, to convey by a deed of herself and her husband.

A vendue deed, when the proceedings were not recorded in pursuance of the statute, does not convey any title.

A suit commenced by the children of the feme is not barred by the statute of limitations, when the suit was brought within fifteen years after the death of both husband and wife.

EJECTMENT for seventy-five acres of land in Rutland. Plea, not guilty. Issue to the court.

On the trial in the county court, it appeared that, on the 9th day of June, 1774, Daniel Harris, of said Rutland, by his last will and testament duly executed, devised to his

daughter, Elizabeth Harris, " *and to the lawful heirs of her body,*" the premises in question ; that said will was approved by Joseph Bowker, judge of probate for the district of Rutland, on the 2d day of May, 1781, whose certificate of the administration of the oath to the witnesses of the will, was made by him as a justice of the peace ; that subsequent to the making of the will, the said Elizabeth Harris intermarried with Christopher Bates, and that after the marriage, and after children born, the issue of such marriage, to wit, on the 1st day of January, 1797, the said Christopher and Elizabeth executed a deed of said premises, with a covenant of warranty, to Issachar Reed, which deed was acknowledged both by the said Christopher and Elizabeth, *before a justice of the peace,* on the 1st of April, 1797; and that there was a regular chain of conveyances of said premises from said Reed to the defendants.

RUTLAND,
*February,*
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

It appeared that the wife of the said Giddings, plaintiff, together with the plaintiffs, Roswell, David, Louis, Harris, Amy and Hopey Bates, were children of the said Elizabeth, and claimed the premises in question as an estate tail, under the will of Daniel Harris.

In addition to the claim of title through the conveyance to Reed, the defendants, also, claimed under a vendue deed, dated the 20th of November, 1801, from the collector of the town of Rutland to the said Reed, executed upon a sale of the premises, under a tax, granted by the legislature, at its October session, 1797. Parol evidence was offered to show, that said collector had once had a warrant from the state treasurer, to collect the tax on which said premises were sold, and had lost the same. The defendants offered a receipt from the town clerk of Rutland, dated in July, 1798, specifying that a duly attested copy of the notification of a vendue for the sale of land under said tax, and of the sales made in pursuance thereof, was received by him from the collector—which was accompanied by parol evidence that no record of the proceedings of the collector, specified in said receipt, could be found.

The court decided that the said vendue deed, and the evidence offered in relation thereto, were insufficient to give the defendants a title, and rejected the same.

The defendants objected to the admission of the will of

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

Daniel Harris, for the reason that it was not properly execu-
ted and probated.

It appeared that Christopher Bates and Elizabeth, his wife,
had died less than fifteen years before the bringing of this
suit.

The court decided that, under this showing, the plaintiffs
were entitled to recover ; to which decision, and the previ-
ous decisions of the court, the defendants excepted.

*E. L. Ormsbee,* for defendant.

The doctrine of entails is wholly at variance with our insti-
tutions, the spirit of our laws, and the express language of our
constitution ; and it is the duty of the courts to give a liberal
and beneficial construction to all general laws, bearing upon
the subject, by which the proposed end of this wise provis-
ion in the organic law can be best attained. In adopting
the common law, the provision in the constitution must be
taken, as clearly indicating that estates like the one created
in this will, should be considered as conditional fees, subject
to alienation on the birth of issue.

Vt. Stat. Papers, 20, 70, 73, 79, 241, 287 ; Laws of New
York, vol. 1, p. 44 ; 4 Kent's Com. 14 ; Vt. St. P. 190, 195,
434, 288, 450 ;  2 Black. Com. 45, 110, n., 287 ;  Crabb's
Hist. of Eng. Law, 13, 177 ; 1 Rep. 131 ; 6 Rep. 49 ; 3
Ch. Ca. 17, 20, 36, 48 ;  1 Vt. R. 6, 164, 161 ; Cro. Car.
230 ; 2 Mod. 287 ;  Salk. 229 ;  1 Willes' R. 73 ; 8 Mass.
R. 37 ; Lingard's Hist. of Eng. vol. 3. p. 215 ; 4. J. Burr.
25, 79 ;  1 Plow. 235 ;  Brougham's Hist. Sketches, vol. 1,
p. 180 ;  Rev. Stat. p. 7 ;  Vt. St. P. 250 ; 2 Black. Com.
111, 355, 117 ;  N. Chip. R. 122 ;  Slade's Stat. 167, 189,
84 ;  4 Kent's Com. 13, 166 ;  8 Vt. R. 291 ;  Tolman's
Stat. 210, 212 ;  Kirby's R. 110, 176 ;  3 Days. R. 332 ;  1
Bro. C. C. 325 ;  4 Kent's Com. 12 ; 1 Inst. 19, a ;  Plow-
den, 239, 247, 223 ;  Viner's Ab. Estate F., pl. 2, 3 ;  1
Rolle's Ab. 841, D. pl. 1, 2 ; 7 R. 125 ;  4 Kent's Com.
15, n. b ;  Slade's Stat. 52, 167.

The statute *de donis* is inapplicable to our local situation
and circumstances, and repugnant to the provisions of our
constitution. It has never been, expressly, by act of the
legislature, or by judicial decision, adopted as part of our
system of laws.

Rutland,
February,
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

On general principles, to regulate entails so as to prevent perpetuities by allowing alienation by simple deed of record, (a mode equally advantageous, as it regards both perpetuation and publicity or constructive notice, and far more efficient, under our system of registration, as it respects actual notice to all concerned,) is far preferable to obtaining the same end by the highly artificial mode of fine and recovery—a mode unadapted to our habits, expensive, and, until since the pendency of this suit, unknown in our practice. Alienation is more in analogy with the short and simple provisions of the civil laws,—the system best adapted to a civilized people.

Fine and recovery is merely a mode of conveyance. As such, not only has it never been adopted in this state, but it has been expressly excluded by statute. Slade's Comp., p. 187, §8, p. 171, §12. But if it is held that fine and recovery is an action, then it is taken away by the statute regulating the mode of prosecuting for the recovery of real estate. Slade's Comp. p. 84, §88.

If the above views are not adopted, the defendants insist that the alienation by Bates and his wife, worked a forfeiture of their estate, and from that period, the statute of limitations would run. From the time the vendue deed was taken, and, *a fortiori*, from the time that I. Reed, claiming under that, gave a warrantee deed to Zerah Mead, who took possession under it, it must be considered that an adverse title was set up, and from that period the statute of limitations must have commenced running. Where possession was taken and continued, many things should be presumed in favor of so ancient a vendue, especially in favor of quieting so ancient a possession.

Parol evidence to show that the collector had once had a warrant and had lost the same, and parol evidence of its contents were admissible. It appears that a copy of the collector's proceedings was left with the town clerk, for record, and though no record can now be found, it is fairly presumable that the proceedings were recorded and that the record is lost.

The probate of the will was defective, because,

1. The proof was taken before a justice of the peace, and not in the probate court; and

2. Because the will was probated, without any notice to

RUTLAND,
February,
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

the parties interested.   1 D. Chip. R. 357 ;   14 Mass. R.
222 ;   2 Vt. R. 339 ;   3 Johns. R. 474 ; 6 Johns. R. 281 ;
9 T. R. 270.

*R. Pierpont* and *J. Collamer* argued for plaintiffs.

The opinion of the court was delivered by

WILLIAMS, Ch. J.—The importance of the question in
this case appears from the fact that it has been three times
before the court, and the case is, probably, the first and only
one in which it has been the subject either of discussion or
adjudication in our judicial tribunals.   Several points have
been made in the argument, and it may be proper to notice
them, as the court have deliberated upon them, and are pre-
pared to express their opinion.

An objection was made to the will of Daniel Harris as not
being properly executed, or proved.   The objection to the
execution of the will has not been much insisted on ; and it
seems to be unobjectionable.  The will was executed by the tes-
tator in the presence of three witnesses, who signed their names
as witnesses, in the presence of the testator and also in the
presence of each other.

At the time this will was proved, no directions were given
in the statute, in what manner the court of probate should
proceed.

The executor was required to present it for probate, under
a penalty, and jurisdiction over the subject-matter was given
to the court of probate.   The judge, who was, also, a jus-
tice of the peace, swore the witnesses before him as justice,
from a doubt then entertained whether, as judge of probate,
he could administer an oath ; and, having considered the
testimony, he approved the will and it was recorded. If there
was any apparent irregularity in his proceedings, which, how-
ever, we do not perceive, we should think that, at this
distance of time, the regularity of the previous proceedings
of the court, should be presumed, according to the decisions
in *Collard* v. *Crane*, Brayton, 18 ; and *Judge of Probate*
v. *Fillmore*, 1 D. Chip. 420.

An old will, even when it appeared not to be proved and
recorded, as the law directed, was allowed to be read as
evidence, as an ancient deed, although actual possession did

RUTLAND,
February,
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

not follow and accompany the will. *Jackson* v. *Laraway*, 3 Johns. Cas. 283. And in the case of *Jackson* v. *Blanshan*, 3 Johns. R. 292, a will, when thirty years had elapsed since its execution, was allowed to be read as evidence when the possession had been held under it for twenty-seven years. Both parties claim under the devisee, in this case, and the possession was under her, and, of course, under the will, until within fifteen years previous to the commencement of this suit. We see, therefore, no objection whatever to the reception of the will as evidence, whether duly proved or not ; and moreover we have no doubt it was executed and proved according to the law then existing.

The next question is, what estate was given by the will to Elizabeth Harris, the mother of the present plaintiffs, who, it appears, intermarried with Christopher Bates, and with him, in 1797, executed the deed to Issachar Reed, under which the defendants are in possession. The will was dated June 9, 1774, and approved May 2, 1781. The devise is in the following words : " I give to my well beloved daughter, Elizabeth Harris, and to the lawful heirs of her body, one hundred acres of land," &c. The land in controversy is part of the land devised to her. The intention of the testator, at the time he made the will, is to be learned, and when ascertained to be carried into effect. This intention must be the one he had at the time he made the will. For although it has been said, that a will must be made to speak from the testator's death, and be looked on, not only as his last will, but as his last words ; yet it cannot be made to speak any thing different, or more than what the testator said when he made it. If it does, the law would make the will and not the testator ; and an intention, other and different than his, and other and different from what he expressed, would be carried into effect.

The technical effect of the words of a will is presumed to be intended, unless the contrary appears from the will. The instances are numerous, where words of purchase are made words of descent. The words, issue—son—children, are words of purchase, yet they have been made words of descent in a will. The word here is a word of descent, and yet in Mandeville's case, Co. Litt. 266, it was a word of purchase. In the case before us, there is nothing to show that

Rutland,
*February,*
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

the testator did not intend the words made use of should be considered in their technical meaning. At the time this will was made, the testator resided in a territory within the jurisdiction of the state of New-York. He describes himself " I, Daniel Harris, of Rutland, in the province of Charlotte, in New-York." The language made use of in the devise is technical and artificial—" to Elizabeth Harris, and the lawful heirs of her body." These words were early adjudged to create an estate tail. *Clark* v. *Day,* Cro. Eliz. 313. If the testator had reference to the law of the state of New-York, these estates tail had existed, ever since it had been an English colony, and these words had acquired a precise and definite meaning, and created an estate tail with all its incidents. If we were permitted to suppose that the testator was an emigrant from the New England states, surrounded with a New England population, and made use of the words as there understood, the words had the same meaning there ; for in Massachusetts, Connecticut, Rhode Island and New Hampshire, estates tail were known, and these words were considered as creating such an estate. In the year 1636 the colony of New Plymouth enacted that all the lands heretofore *entailed*, and that shall be *entailed*, hereafter, shall descend and enure, as by the law of England the same ought to do. In Massachusetts, " the doctrine of estates tail was adopted by the collection of principles in 1641, called ' Fundamentals,' and has operated from that time." In Connecticut it has been decided that a devise to a man and the heirs of his body lawfully begotten, gives an estate tail. This was under a will made in 1739, and was decided in the year 1780. *Manwaring* v. *Tabor*, 1 Root, 79. The same was decided under a will made in 1783. *Allen & Wife* v. *Bunce*, 1 Root, 96, and a case there cited, of *Kimberly* v. *Hale*, under a will made in 1727. *Wells et ux.* v. *Orcutt*, Kir. 118, and *Chappel* v. *Brewster*, Kir. 175, are to the same effect. The doctrine of entailments was modified, however, in some measure in Connecticut. They consider that estates given in tail, vest an estate in tail in the first donee, which he could not dispose of, or incumber, for a longer term than his own life, and an estate in fee simple absolute in his issue, either because they thought such a modification better suited their institutions and circumstances, or because they considered it

RUTLAND,
*February,*
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

as the common law, before the decisions in England made them conditional fees, or because the natural import of the words intended such an estate.

The doctrine of conditional fees, as it was considered in England before the statute *de donis,* and which called for, and caused the enactment of that statute, was expressly repudiated in Connecticut, in the case of *Allen & wife* v. *Bunce,* before mentioned, and rejected in the other cases there mentioned, and does not appear ever to have been recognized in New England or New York. The policy which induced the courts of justice to give them a construction inconsistent with their original intention, does not appear ever to have prevailed in this country, except in the state of South Carolina. This view of the case is, we apprehend, abundantly sufficient to shew what was meant, and what the testator meant, at the time he made his will, by the terms " lawful heirs of her body."

We are, then, to inquire whether there was any change in the government, policy, or laws existing at the death of the testator, to prevent his intention from being fulfilled, and which would avoid the devise and prevent the devisee from taking the estate intended to be given her ; for I apprehend the statute could not make a will for the devisor, and give the land, directly contrary to his will as expressed at the time of its execution.

At what time the testator deceased does not appear ; but probably it was a short time before the will was approved, at which time there had been a change of jurisdiction over the territory now comprised in the state of Vermont, and in which the land devised was situated ; and nothing can be found in the constitution or laws of the state of Vermont which, as we can discover, should prevent this devise from taking effect. In 1777, Vermont established a separate government, and adopted a constitution, and from that time was, *de jure,* and *de facto,* an independent, sovereign state. In this constitution, they recognize entails as existing, and do not abolish them, but require that " a *future* legislature shall regulate entails in such a manner as to prevent perpetuities." A similar provision has been introduced in every constitution since made, and is now an article in the existing constitution of this state. The legislature have passed no acts upon the

RUTLAND,
February,
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

subject of entails, until the revision in 1839, nor made any regulations about them. Probably they have considered that entails, as existing, did not create any perpetuity, inasmuch as, by the law of England, New-York, and Massachusetts, before they were entirely abolished by statute, they could be barred by a common recovery; and in Connecticut their effect had been so declared as to give the first donee only an estate for life, and to his heirs a fee simple. The first attempt to regulate entails by statute, was in the 59th chapter of the Revised Statutes, (passed in 1839,) section 1.

After the first constitution was adopted, at the session of the legislature holden in 1778, they had recourse to Connecticut for their laws, and from the journal of the legislature we learn they passed several acts as the said acts stand in the *Connecticut law book.* They voted that the fees of the court of probate be *"three times as much as established in the Connecticut law.* In February, 1779, they enacted " that *common law*, as it is generally practiced and under-' stood, in the New England States, be, and is hereby estab-' lished as the common law of this state." This statute was in force at the time the testator deceased. It is not necessary to examine the provisions of the statute particularly, as we do not consider them as making any alteration in the nature of the estate in question. Common law, as *practiced* and *understood*, probably meant, as considered or altered by statute or by judicial constructions, and as it was adapted to our local circumstances and usages, generally adopted. It is most probable they had reference to the common law as understood and established by usage, or the determination of the courts in Connecticut, as that appears to be the state to which the legislature had particular reference in passing laws.

It may not be necessary to pursue the history of our laws on this subject further, as these were all the laws existing when the devise took effect; and it appears to us, very clearly, that, as estates tail were then known and recognized in New England, and in most of the states of the Union, and in the constitution of this state, no alteration was made by our law to prevent the devise to Elizabeth Harris from taking effect according to the will of the testator.

But if we follow the history of our law from that time to

Giddings &
Wife *et al.*
*v*
Smith *et al.*

the present, we find, as it appears to us, that such estates have always been known in this state to the present day. In June, 1782, the legislature passed an act, wherein they recite that " the inhabitants of this state have been habituated ' to conform their manners to English law, and hold their ' real estate by English tenure," and enact, " that so much of ' the common law of England as is not repugnant to the ' constitution, or any act of the legislature, be adopted, and ' shall be, and *continue* to be, law within this state ;" and that such " statute laws and parts of laws of the kingdom of ' England, passed before October, A. D. 1760, for the altera-' tion and explanation of the common law, &c., shall be, and ' continue to be, law within this state." This law was continued to the revision made in 1797, with the alteration only, that, in the laws passed in 1787, adopting the statute laws of England, they omit the word *alteration,* and adopt only such as were made for the *explanation* of the common law. In the year 1792, in the reports and dissertations published by our eminent citizen, Judge Chipman, he speaks of the whole chapter of entails as abridged, perhaps expunged ; and this distinguished and able judge, and lawyer, and statesman, who has done so much to give stability, and form, and substance to our laws and civil and political institutions, and who, in that way, gave a higher character to our state than any other man whatever, in connection with another eminent lawyer, were appointed a committee to revise our laws, and in 1797 they reported a system of laws, which was adopted and published by the legislature, and which is probably equal, if not superior, to any body of statute laws which have ever been passed in this country. In one of the statutes reported by them, it is enacted, that no deed or other conveyance, in fee simple, *fee tail,* or for term of life, or any lease for more than one year, &c., shall be good and effectual, &c., unless acknowledged and recorded. Slade's Stat. 167. And, in another statute in relation to joint tenancies, &c., they say, all gifts, grants, feoffments, devises, and other conveyances, &c., whether for years, for life, in *tail,* or in fee, shall be taken, &c. Slade's Stat. 177. By thus enumerating the several estates, for life, in fee simple, and fee tail, which existed in England, they directly recognized their existence here, and that they might continue to exist thereafter. In

Rutland,
*February,*
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

the revision of our statutes, which took place in 1839, chap. 59, page 309, the legislature, for the first time, attempt to regulate the subject of entails, probably satisfied with the manner in which they existed, and also satisfied that if any legislature should attempt to create perpetuities, the constitutional inhibition would prevent it. In this statute they adopt the law on this subject, as it was always understood in Connecticut, and declare that the first donee in tail shall be seized thereof for his natural life only, and the remainder shall pass, in fee simple, absolute, to the person who, on the death of the first donee, grantee, or devisee, would succeed to the estate, by virtue of the gift, grant, conveyance, or devise.

In view of the law, as it existed when the testator made his will, and as it has continued to exist, with the alterations and explanations, we have no doubt, but that, by the words of the will, Elizabeth Harris took an estate tail, *secundam formam doni.*

The question then arises whether, by any act of Elizabeth Harris, the estate has been barred or aliened, so as to prevent it from vesting in the heirs of her body, the present plaintiffs.

By the law, as existing before the statute *de donis,* and while conditional estates were recognized, if a feme tenant in tail, had taken husband, and had issue, and the husband and wife had aliened, in fee, by deed, yet the issue might have a *formedon in descender,* for the alienation was not lawful; but otherwise if it had been by fine. Co. Litt. 19, a. By the law of New York, until 1782, and by the law of Massachusetts, until 1786, and by the law as existing in England, an estate tail would not be barred by a deed, but only by a common recovery. In Connecticut, the first donee could not bar, or convey, the estate, except during his or her life. In Rhode Island it could be barred by a deed, executed and acknowledged agreeably to the directions of their statute. No such statute has ever been passed in this state; and if in New York it was necessary to pass the statute of 1782, and in Massachusetts to pass the statute of 1786, and in Rhode Island their statute, for the purpose of enabling the tenant in tail, by deed, to convey the estate, the same necessity exists in this state; and, for want of such statute, the

estates must remain as they were in those states before the passing of those statutes.

It is, however, urged that the statute of conveyancing, which was passed in 1787, and which was in operation at the time Christopher Bates and his wife, the devisee under the will, executed the deed to Issachar Reed, authorized them to bar the issue as well as the reversion. The statute was as follows: " All deeds or conveyances of any houses or lands ' within this state, signed, sealed, and delivered by the par- ' ties granting the same, *having good and lawful authority*, ' attested, acknowledged, and recorded, &c. shall be valid ' to pass the same, without any other act or ceremony in the ' law whatsoever—want of livery of seizin or attornment of the ' possessors, notwithstanding." By a subsequent section, it is further provided that no real estate whereof a feme covert is or shall be seized, shall henceforth pass by deed of herself and her baron, without a previous acknowledgment made by her, apart from her husband, before a counsellor, a judge of the supreme court, or of the county court. Haswell's Stat. 32. This statute only authorized those to deed and convey, who had good and lawful authority so to do, and dispensed with livery of seizin and attornment. This act does not determine who has the right, nor give any right where none existed before, but leaves that to be determined by the laws then in force. Elizabeth Bates had no authority, by *common law*, nor by *statute, to bar* the issue in tail, or the reversion, by a deed of herself or baron, or even to convey her own estate in fee simple, except by a deed executed according to the direction given in the statute; and in the dissertation upon this statute, by judge Chipman, it is neither asserted nor intimated, that the statute was to have any effect similar to the one now demanded for it; and, indeed, it is difficult to see how the words, " *having good and lawful authority*," should be construed as giving authority, when none before existed. In Massachusetts, by their provincial statute, Wil. 3, c. 7, it was provided, that such as have *good and lawful authority* to convey houses or lands, may deed, by deed acknowledged, &c. Under this statute it would seem as though it might be argued with some degree of plausibility, that all who could convey, by any species of conveyance, could, by virtue of that statute,

RUTLAND,
*February*,
1843.

Giddings &
Wife *et at.*
*v.*
Smith *et al.*

RUTLAND,
February,
1843.

Giddings &
Wife *et al.*
*v.*
Smith *et al.*

convey by deed. It was, however, said by Chief Justice Parsons, when an attempt was made to account for the origin of an usage for a feme covert to convey by a deed of herself and baron, under this statute, that " one objection to ' this reasoning is, that, according to the practical construc- ' tion of the statute, it proves too much ; *for a tenant in tail* ' *can convey by common recovery, yet it was never supposed* ' *that, under this statute, he can convey so as to bar his issue* ' *or those in remainder or reversion.*" *Fowler* v. *Shearer,* 7 Mass. 14. We can see nothing, therefore, in this statute which would justify us in drawing the conclusion that an estate tail of a feme covert, whether as known in England, or in Connecticut, or in this state, can, or ever could be, barred by a deed of the husband and wife.

But there is a still further objection to the deed executed by Bates and his wife to Reed, presented at this argument for the first time, which, in our view, is entirely fatal to it, as conveying the estate of Elizabeth Bates. The statute of 1797 was the first which authorised a *justice of the peace* to take the acknowledgment of a deed of a feme covert. This statute was suspended and did not go into operation until September, 1798. The deed in question purports to have been dated in January, 1797, and to be acknowledged before Moses Watkins, justice of the peace, in April, 1797, who took the separate examination of the wife. We have already noticed that, by the act of 1787, in force both at the date, and acknowledgment of this deed, no estate of a feme covert could, thereafter, pass, by deed of herself and her baron, without a previous acknowledgment made by her, apart from her husband, before a counsellor or judge of the supreme, or county court ; and it was further enacted that a certificate of such acknowledgment should be entered on the deed, by the magistrate, and that every alienation, &c. not acknowledged, together with a certificate of such acknowledgment, was declared to be *ipso facto* void. This deed was not so aknowledged, as Mr. Watkins had no authority to take the acknowledgment as justice of the peace, and was, as to her, *ipso facto* void. The attempt of the legislature to give force and efficacy, by an act of the legislature, to a deed, executed by Job & Theoda Wood, husband and wife, and acknowleged as the law directs, by

her, separate and apart from her husband, but where the
magistrate omitted to make the certificate, and was dead at
the time of passing the act, was pointedly condemned by
the council of censors, disregarded by the judicial tribunals,
and repealed by a subsequent legislature.   Acts of 1812,
chap. 17, and of 1814, chap. 8.

The remaining questions, in this case, are few and of easy solution.   These plaintiffs are not estopped by the covenant of warranty, contained in the deed of Christopher Bates and his wife.   The deed was void, as to her, as we have already remarked.   The wife is never bound by the covenants contained in a deed, except in the case of a fine; and the issue of a tenant, in tail, is not estopped by any deed, with covenants, executed by the ancestor.   The plaintiffs claim under the will of their grandfather.

The vendue deed was correctly rejected (as the proceedings were not recorded) on the authority of the case, *Sumner* v. *Sherman et al.*, 13 Vt. R. 609.

The statute of limitations cannot avail the defendants, as it appears by the case, that both Christopher Bates, and his wife, died within fifteen years before the commencement of this suit.   The deed from Bates and wife to Reed, was good to convey all the interest of Bates, according to repeated decisions;   and no one, until his death, could disturb the possession taken under that deed; and with respect to Elizabeth, the statutes of 1787 and 1797 expressly reserve the rights of a feme covert; and as to her, no statute of limitation would commence, until, by the death of her husband, the impediment was removed, and she became discovert; and this action was commenced within fifteen years from that time.

On the whole, we think the county court were correct in all their decisions.   The will was duly proved.   Elizabeth Harris took an estate tail, under it, either as it was understood in England, and most of the states of the Union, or as it was understood in Connecticut.   We think that this estate was not barred by the deed of herself and husband to Issachar Reed, and that there is no impediment in the way of the present plaintiffs' recovering the estate, according to the will of the testator, either from the vendue deed, or the statute of limitations.   Moreover, we do not see anything in the

RUTLAND,
February,
1843.

policy of our government, at war with the doctrine of entailments, as they are not, and never have been, perpetuities ; and this, or similar provisions are highly useful to enable a man to give to another an estate, to be enjoyed during the life, only, of the first donee, and after that to go to his heirs in fee simple.

We have said nothing upon the subject of common recoveries, as it was not involved, necessarily, in the decision of the question now before us. They have not been resorted to, nor do I know that it was ever necessary to resort to them in this state. This is the only case where the subject of entailments has come before the court; and for all future gifts in tail, the statute has declared their effect.

I would only add, in answer to the argument so much dwelt on, that common recoveries are in opposition to, and not consistent with, our recording system, that they are not more so than a title acquired by possession, the effect of a judgment in ejectment, or the lien acquired by a *lis pendens ;* the evidence of neither of which, appears on the records of deeds in the town or county clerk's office.

The judgment of the county court is affirmed.